UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL STUDENT LEGAL DEFENSE
NETWORK,

             Plaintiff,

         v.

UNITED STATES DEPARTMENT OF
EDUCATION,

             Defendant.

Civil Action No. 21-1923 (BAH)

Judge Beryl A. Howell

**MEMORANDUM OPINION**

    Plaintiff National Student Legal Defense Network challenges the United States Department of Education's ("ED") withholding, in response to plaintiff's request, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, of eight unique email communications in email chains between an ED attorney and an attorney for the Social Security Administration ("SSA"), occurring between September 13 and 23, 2019, which communications have been largely redacted on nineteen disclosed pages. ED withheld release of the disputed emails under FOIA Exemption 5, 5 U.S.C. § 552(b)(5), asserting that these emails are subject to the attorney work product and deliberative process privileges.

    The parties have now cross-moved for summary judgment. Def.'s Mot. Summ. J., ECF No. 19 ("Def.'s Mot."); Pl.'s Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 23. Following *in camera* review of the disputed withheld records, for the reasons set forth below, summary judgment is granted to ED and denied to plaintiff.

**I.    BACKGROUND**

1

The background underlying plaintiff's FOIA request is described below, followed by a review of plaintiff's FOIA request and initiation of the instant lawsuit.

### A. Gainful Employment Rule

The Higher Education Act of 1965, as amended, ("HEA") 20 U.S.C. § 1001, *et seq.*, authorizes the federal government to deliver financial aid to students at post-secondary institutions of higher learning.  20 U.S.C. § 1070.  This educational loan program sponsored by the federal government "provide[s] more than $150 billion in new federal aid" to students at post-secondary schools every year, including "private for-profit institutions, public institutions, and private nonprofit institutions." *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 435 (D.C. Cir. 2012) (citation omitted).  While these students are expected eventually to repay their debt to the federal government, the post-secondary institutions attended by recipient students receive the tuition payments up front, so Congress enacted a series of statutory requirements to discourage these institutions from taking students'—and thus the taxpayers'—money without providing those students with a quality education. *Id.*

One such protection established by Congress is the "gainful employment" rule, which limits institutions eligible to receive federal loans to those schools that "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation[.]" 20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A).  No definition of "gainful employment" is provided in the statute, but the authority to "make, promulgate, issue, rescind, and amend rules and regulations governing" Title IV programs is vested with ED's Secretary, *id.* § 1221e–3, including the authority to define, via regulation, what constitutes "gainful employment," *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 182 (D.D.C. 2015).

In 2014, ED implemented regulations for the gainful employment rule, setting criteria to determine the eligibility of institutions to participate in federal student aid programs. *See* 79 Fed. Reg. 16,426, 16,433 (Mar. 25, 2014); *accord Maryland v. Dep't of Educ.*, 474 F. Supp. 3d 13, 19, 21–22 (D.D.C. 2020) (Jackson, K.B., J.), *vacated and rev'd on other grounds*, 2020 WL 7868112, at *1 (D.C. Cir. Dec. 22, 2020). As relevant here, the regulations required ED to calculate and publish a "debt-to-earnings rate" for participating programs, with that rate used to designate each as "passing," "in the zone," or "failing." *Maryland*, 474 F. Supp. 3d at 23 (citing 34 C.F.R. §§ 668.403(b), 668.403(c) (2019)). Under these regulations, any program receiving a failing debt-to-earnings rate in two of any three consecutive years or a combination of "in the zone" and "failing" for four consecutive years, would be deemed ineligible. *Id.* at 23–24 (citing 34 C.F.R. §§ 668.403(c)(4)(i), (ii) (2019)).

Pursuant to a Memorandum of Understanding ("MOU"), the SSA agreed to provide ED with the aggregate earnings data needed for the pertinent calculations of the debt-to-earnings rates. *Am. Fed'n of Tchrs. v. DeVos*, 484 F. Supp. 3d 731, 746 (N.D. Cal. 2020). On May 24, 2018, however, the MOU between SSA and ED expired and was not renewed, Defendant's Statement of Material Facts ("Def.'s SMF") ¶ 9, ECF No. 19-2; Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s SMF") ¶ 9, ECF No. 21-1, resulting in ED no longer receiving from SSA the earnings data necessary to implement the gainful employment regulations, *see Am. Fed'n of Tchrs. v. DeVos*, 484 F. Supp. 3d at 746. Plaintiff asserts that prior to the MOU's expiration, ED had "asked the SSA to renew the MOU, but SSA did not do so." Pl.'s Counterstatement of Material Facts ("CSMF") ¶ 4, ECF No. 21-1 (citation omitted).

On July 1, 2019, ED rescinded the gainful employment regulations, effective on July 1, 2020. 84 Fed. Reg. 31,392.

**B. Plaintiff's FOIA Request**

On May 6, 2020, plaintiff submitted to ED a FOIA request seeking the following information from after January 1, 2017:

> A copy of every communication to and from the . . . []SSA[] or any other federal agency relating to the calculation of debt-to-earnings rates, including any communication to or form the SSA requesting data or information to be used in order to calculate debt-to-earnings rates.
> Any communication between [ED] and SSA related to Agreement No. 10012, or requesting or providing information to be provided pursuant to Agreement No. 10012.
> Any communication between [ED] and SSA related to information or data pertaining to the Gainful Employment regulations.
> Any emails or other documents relating to the expiration of Agreement No. 10012.

Compl. ¶¶ 12–13.

Less than three months later, on July 16, 2021, plaintiff filed the instant lawsuit, alleging ED: (1) failed to conduct an adequate search for responsive records, and (2) wrongfully withheld non-exempt records requested by plaintiff. Compl. ¶¶ 21–33. In response to plaintiff's FOIA request, ED produced, on October 15, 2021, the disputed 19 pages of redacted emails and, on October 29, 2021, 116 pages of redacted communications, Def.'s SMF ¶¶ 13–14, which production is not disputed, Pl.'s SMF ¶ 14. Over the course of the ensuing litigation, ED has produced three *Vaughn* indices explaining the agency's evolving reasoning for withholding the redacted emails, with the final revised *Vaughn* index produced on September 12, 2022. Pl.'s CSMF ¶¶ 30–31; s*ee id.* ¶¶ 14–16 (describing withheld disputed records in first *Vaughn* index, produced on January 25, 2022, as exempt under the attorney work product privilege because the communications were made, according to defendant, "in contemplation of possible future litigation regarding gainful employment and the MOU between ED and SSA, which share a common interest in this matter," and the deliberative process privilege because Steven Finley, a General Attorney in the Division

of Postsecondary Education in ED's Office of the General Counsel, sought "potential answers to substantive questions raised regarding the scope of the MOU between SSA and [ED]"); *id.* ¶¶ 23, 27 (describing withheld disputed records in revised *Vaughn* index, produced on May 6, 2022, as protected by attorney-client privilege, but withdrawing assertion of such protection as to certain withheld information and clarifying that ED was "not, at this time, asserting a common interest privilege" with the SSA).

### C.  ED's Explanations for Withholding the Disputed Emails

In support of the challenged withholdings, Steven Finley explains that the disputed emails consist of his communications with SSA officials.  Def.'s SMF ¶ 17; Def.'s Mot., Ex. 3, Decl. of Steven Z. Finley ("Finley Decl.") ¶¶ 1, 7–10, ECF No. 19-5.  On September 13, 2019, Finley initiated communications by sending an email "to Ruthie Bright and Rona Demb, employees at SSA" to request "a point of contact within SSA's General Counsel's office" and inform them that he sought certain "information regarding SSA's decision not to renew the . . . MOU with [ED]." Finley Decl. ¶ 8.  "The September 20 and 23, 2019 emails were exchanged between [Finley] and Terri Daniel, an attorney in SSA's Office of General Law," in which Finley sought "information related to SSA's decision not to renew the . . . MOU with the Department, and Ms. Daniel described her understanding of the SSA's position." *Id.* ¶ 9.  According to Finley, these communications reflect his "attempt to obtain documentary support regarding SSA's decision not to renew the . . . MOU," so that he could "obtain specific information that would allow [him] to better formulate [his] recommendations and analysis regarding the Department's legal strategy for the gainful employment litigation," *id.* ¶ 10, since ED "anticipated that the reason for rescission of the regulations would likely arise in future litigation against the Department," Def.'s SMF ¶ 23. Indeed, in 2020—in the year following the exchange of disputed emails—complaints were filed

challenging the legality of the rescission of the gainful employment regulations. Def.'s SMF ¶ 24 (citing *Am. Fed. of Teachers v. Devos* and *California v. Devos*, 484 F. Supp. 3d 731 (N.D. Cal. 2020), and *Pennsylvania v. Devos*, No. 20-CV-1719 (ACR) (D.D.C. 2020)).[1]

Finley further clarified that he was also seeking assistance from SSA in preparation for pending litigation concerning the gainful employment regulations, as outlined in a September 20, 2019 email from Finley to an SSA attorney, Terri Daniel. *See* Supplemental Declaration of Steve Finley ("Finley Suppl. Decl.") ¶ 6, ECF No. 28-2; *see also* Def.'s Reply, Ex. 1, Supplemental Declaration of Jill Siegelbaum ("Siegelbaum Suppl. Decl."), Ex. A., Redacted Finley Communications, ECF No. 28-1. In particular, Finley quotes, in the Supplemental Finley Declaration, from his September 20, 2019 email to Daniel stating:

> Education still has some litigation involving the [gainful employment] regulations, even though a new regulation was recently published that rescinds them. Education has filed a motion to dismiss the older [gainful employment] litigation as moot. Part of the objections from the plaintiffs is that ED has never provided any evidence to support its statements that SSA declined to renew the MOU. Since ED does not have anything from SSA on that point, I am looking for . . . . I am not asking for anyone to create anything for ED, but I want to see if there is anything from SSA that DOJ could use in responding to that point raised by the plaintiffs.

Finley Suppl. Decl. (quoting Redacted Finley Communications at 10). Finley explains that his email references litigation in *Maryland v. Department of Education*, 474 F. Supp. 3d 13 (D.D.C. 2020), challenging ED's delay in implementing the gainful employment regulations that was pending at the time. *Id*. ¶ 6.[2]

---

[1] *American Federation of Teachers v. Devos* has since been recaptioned *Baltezar v. Cardona*, No. 5:20-CV-455 (N.D. Cal.).

[2] Finley explained in his original declaration that these emails were also "intended to help establish a robust administrative record for the rescission." Finley Decl. ¶ 10. In his supplemental declaration, however, Finley clarified that establishing a robust administrative record "was not the primary reason for my outreach to SSA," and his use of the word "establish" "was inaccurate because the rescission rule had already been issued," and he "should have more precisely stated that [he] . . . sought information that might bolster the Department's statements in the rescission rule that SSA declined to renew the MOU, to defend against any future challenge to the rescission rule that raised issues similar to those raised by the *Maryland* plaintiffs." Finley Suppl. Decl. ¶ 7.

ED also justifies withholding on deliberative process privilege grounds, Def.'s SMF ¶ 25, asserting that release of the disputed emails would "cause a significant chilling effect on candid inquiries and analyses necessary to develop recommendations that allow the Department to determine what actions to take in order to minimize potential litigation risks," *id.* ¶ 26 (quoting Def.'s Mot., Ex. 1, Declaration of Jill Siegelbaum ("Siegelbaum Decl.") at Ex. D, *Vaughn* Index, ECF No. 19-3) (alteration in original)).  Finley echoes these concerns, explaining that release would have "a significant chilling effect both on intra-agency clients and attorneys whose candor is necessary to develop an effective legal strategy, and on federal agency employees' ability to engage in frank discussions during the deliberative process."  Finley Decl. ¶ 11.

The parties have cross-moved for summary judgement on whether ED's redactions on the 19 pages of disputed emails are properly withheld under Exemption 5's protections of attorney work product and deliberative process privilege.  *See* Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Opp'n") at 2, ECF No. 21; Def.'s Opp'n Pl.'s Cross-Mot. Summ. J. & Reply Supp. Def.'s Mot. Summ. J. ("Def.'s Reply") at 6, ECF No. 28; Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 1–3, ECF No. 32.  With briefing and *in camera* review of the disputed emails complete, the parties' cross-motions are now ripe for resolution.[3]

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006));

---

[3]  ED was directed to produce for *in camera* review the complete set of disputed emails, *see* Minute Order (June 16, 2023), with which order ED timely complied.  *See* Def.'s Notice of Submission of Documents For In Camera Review, ECF No. 35; Def.'s *Ex Parte* Filing of Documents for In Camera Review, ECF No. 36.

*see also* FED. R. CIV. P. 56(a).  In FOIA cases, "courts must grant summary judgment for an agency if its affidavit: (1) describes the justifications for nondisclosure with 'reasonably specific detail'; and (2) is not substantially called into question by contrary record evidence or evidence of agency bad faith." *Schaerr v. U.S. Dep't of Just.*, 69 F.4th 924, 929 (D.C. Cir. 2023) (quoting *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  Most FOIA cases "can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

"The fundamental principle animating FOIA is public access to government documents." *Waterman v. Internal Revenue Serv.*, 61 F.4th 152, 156 (D.C. Cir. 2023) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999)) *accord DiBacco v. U.S. Army* ("*DiBacco I*"), 795 F.3d 178, 183 (D.C. Cir. 2015).  Agencies are therefore statutorily mandated to "make . . . records promptly available to any person" who submits a request that "reasonably describes such records" and "is made in accordance with [the agency's] published rules."  5 U.S.C. § 552(a)(3)(A).  "Congress, however, did not 'pursue transparency at all costs[;]' [r]ather, it recognized that 'legitimate governmental and private interests could be harmed by release of certain types of information.'" *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.* ("*CREW II*"), 45 F.4th 963, 967 (D.C. Cir. 2022) (first quoting *Hall & Assocs. v. EPA*, 956 F.3d 621, 624 (D.C. Cir. 2020); and then quoting *AquAlliance v. U.S. Bureau of Reclamation*, 856 F.3d 101, 102 (D.C. Cir. 2017)).  To balance those competing interests, "FOIA exempts nine categories of documents from 'the government's otherwise broad duty of disclosure.'" *Waterman*, 61 F.4th at 156 (quoting *AquAlliance*, 856 F.3d at 102).  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

FOIA authorizes federal courts "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). When an agency invokes an exemption to disclosure, district courts must "determine *de novo* whether non-disclosure was permissible." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015). The statute "places the burden 'on the agency to sustain its action,' and the agency therefore bears the burden of proving that it has not 'improperly' withheld the requested records." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice* ("*CREW I*"), 922 F.3d 480, 487 (D.C. Cir. 2019) (first quoting 5 U.S.C. § 552(a)(4)(B); and then quoting *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989)). This burden does not shift even when the requester files a cross-motion for summary judgment because the agency ultimately "bears the burden to establish the applicability of a claimed exemption to any records or portions of records it seeks to withhold," *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016), while "[t]he burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Rsch. Grp. v. U.S. Food & Drug Admin.*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

The agency may sustain "this burden 'by submitting a *Vaughn* index, along with affidavits from agency employees that describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Waterman*, 61 F.4th at 158 (quoting *Am. Immigr. Laws. Ass'n*, 830 F.3d at 673); *see also Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 150 (D.D.C. 2018) ("An agency may

carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate."). "'Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)).

## III.   DISCUSSION

ED maintains that the disputed emails were properly withheld under FOIA Exemption 5, pursuant to the work product doctrine and the deliberative process privilege. Def.'s Mot. at 5–10. In the agency's view, the work product doctrine protects the disputed emails since those communications between counsel from different agencies were made for the purpose of obtaining information to prepare for pending and anticipated litigation involving the gainful employment regulations. *Id.* at 7. As such, ED further claims that the disputed emails are protected by the deliberative process privilege because they were part of ED's "pre-decisional . . . fact gathering [efforts] to assist the Department in arriving at a decision concerning its litigation strategy on how to respond to anticipated litigation about the rescission of the gainful employment rule," *id.* at 9, with both justifications supported by sufficient explanations and declarations, *see* Finley Decl.; Finley Suppl. Decl.; Siegelbaum Decl.; Siegelbaum Suppl. Decl., and *Vaughn* indices.

ED is correct that the eight disputed emails amount to attorney work product since the agency has adequately demonstrated that these communications were made to gather information to help the agency prepare for pending and anticipated litigation concerning the gainful

employment regulations, and therefore these emails are largely protected from disclosure under FOIA Exemption 5.[4]

### A. FOIA Exemption 5 and the Attorney Work Product Doctrine

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the privileges that the Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, . . . and the deliberative process privilege." *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015); *see also Nat'l Ass'n of Crim. Def. Laws. v. U.S. Dep't of Just. Exec. Off. for U.S. Att'ys* ("*NACDL*"), 844 F.3d 246, 249 (D.C. Cir. 2016).

For attorney work product protection to apply, the materials must be prepared by an attorney in anticipation of litigation. *See NACDL*, 844 F.3d at 250 (citing *Hickman v. Taylor*, 329 U.S. 495, 510–12 (1947)); *see also Jud. Watch, Inc. v. U.S. Dep't of Just.*, 391 F. Supp. 3d 43, 50 (D.D.C. 2019) (explaining that the attorney work-product privilege is "intended to protect lawyers and their agents who are assembling facts and law in anticipation of litigation") (citing *Hickman*, 329 U.S. at 508). The D.C. Circuit has "required a case-specific determination that a particular document in fact was prepared in anticipation of litigation before applying the privilege to government records." *NACDL*, 844 F.3d at 251. The inquiry is "a 'because of' test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared because of the prospect of litigation.'" *Id.* (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010)); *Jud. Watch, Inc. v.*

---

[4] In light of this holding, ED's alternative argument for withholding under the deliberative process privilege need not be evaluated.

*Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005) (cleaned up) ("[A]ny part of a document prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under [E]xemption 5."); *Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 10 (D.D.C. 2020) (explaining that the attorney work product privilege "protects 'factual materials prepared in anticipation of litigation, as well as mental impressions, conclusions, opinions, and legal theories'") (*quoting Heggestad v. U.S. Dep't of Just.*, 182 F. Supp. 2d 1, 8 (D.D.C. 2000)). Importantly, "[f]or that standard to be met, the attorney who created the document must have 'had a subjective belief that litigation was a real possibility,' and that subjective belief must have been 'objectively reasonable.'" *NACDL*, 844 F.3d at 251 (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).

### B. The Disputed Emails Are Protected Attorney Work Product

ED argues that the attorney work product doctrine protects the redacted portions of the disputed emails because these communications were initiated and engaged in by Finley, when acting in his capacity as an ED attorney to "attempt to obtain documentary support regarding SSA's decision not to renew the . . . MOU," which information was relevant to inform ED's legal strategy concerning pending and anticipated litigation regarding the gainful employment regulations. Def.'s Mot. at 7 (quoting Def.'s SMF ¶ 21). As ED points out, the agency not only believed that litigation concerning the gainful employment regulations was possible, but that this belief was objectively reasonable, considering litigation over delays in implementing the gainful employment regulations was already pending in the *Maryland* lawsuit at the time of the disputed email communications and, in fact, the anticipated litigation over rescission of those regulations was eventually filed. *Id.*

ED is right. First, the disputed emails contain Finley's "mental impressions, conclusions, [and] opinions" related to pending and potential litigation concerning the gainful employment regulations. *Leopold*, 487 F. Supp. 3d at 10. As his declaration explains, Finley "attempt[ed] to obtain documentary support regarding SSA's decision not to renew the [ ] MOU," so that he could "obtain specific information that would allow [him] to better formulate [his] recommendations and analysis regarding [ED's] legal strategy for gainful employment litigation." Finley Decl. ¶ 10. Indeed, his emails with an attorney in the SSA's Office of General Counsel, in September of 2019, sought "information related to SSA's decision not to renew the . . . MOU with" ED, "provided [Daniel] with contextual information that [he] deemed pertinent and relevant regarding the underlying gainful employment litigation[,] and asked follow-up questions to better understand her responses." *Id.* ¶ 9. Meanwhile, the attorney for SSA's Office of General Counsel responded to Finley with "contextual information that [he] deemed pertinent and relevant regarding the underlying gainful employment litigation." *Id.* As noted above, the MOU was certainly relevant, if not critical, to implementation of the gainful employment regulations by furnishing ED with graduate earning data to support the regulations. *See Am. Fed'n of Tchrs. v. DeVos*, 484 F. Supp. 3d at 746. Finley was also gathering information to respond to the argument asserted in *Maryland v. Department of Education*, a case pending at the time of the disputed emails challenging ED's delay in implementing the gainful employment regulations, that ED had failed to provide evidence that SSA declined to renew the MOU. *See* Finley Suppl. Decl. ¶ 6. Moreover, the fact that Finley initiated the email communications with the SSA's General Counsel's office for the purpose of advising ED on its legal strategy concerning the gainful employment regulations, confirms that the disputed emails were made with the "subjective belief that litigation was a real possibility." *NACDL*, 844 F.3d at 251 (quoting *In re Sealed Case*, 146 F.3d at 884). Finley's declarations thus

13

provide ample support that the disputed emails were made with the purpose of gathering information to help ED in the *Maryland* litigation and other potential litigation concerning the gainful employment regulations.

Second, ED's belief about litigation concerning the gainful employment regulations was objectively reasonable. For one thing, as already noted, Finley reached out to SSA to prepare for the then-pending *Maryland* litigation. Finley Supp. Decl. ¶ 6. Moreover, the regulations had been rescinded by the time Finley had initiated the email communications with SSA, and thus eventual litigation could be reasonably anticipated, as demonstrated by the subsequent filing of three cases challenging the rescission of the gainful employment regulations. *See* Def.'s SMF ¶ 24.[5]

Plaintiff nonetheless maintains that the disputed emails are not protected attorney work product for two reasons. First, plaintiff says "that communications from SSA employees are not [ED's] work product" because the "SSA is not a party in this case and Mr. Finley is not its attorney[.]" Pl.'s Cross-Mem. at 13. Second, plaintiff says that ED's assertion of work product privilege "cannot be reconciled with Mr. Finley's representation that 'these emails were intended to help establish a robust administrative record for the rescission,'" *id.* at 13 (quoting Finley Decl. ¶ 10), and thus the emails "must be turned over to plaintiffs in the Administrative Procedure Act ["APA"] case Mr. Finley was seemingly anticipating," *id.* (emphasis omitted). Neither argument withstands scrutiny.

---

[5] Plaintiff contests ED's reliance on the three eventual lawsuits because those lawsuits had not been filed at the time of the disputed emails communications, proffering that Finley could not have reasonably anticipated that his communications with SSA would become relevant to future litigation not yet filed. Pl.'s Opp'n at 9. Whether legal challenges had been filed when Finley reached out to SSA is not the measure of the scope of the work product doctrine, however. So long as ED's "subjective belief that litigation was a real possibility" was "objectively reasonable," *NACDL*, 844 F.3d at 251 (quoting *In re Sealed Case*, 146 F.3d at 884), attorney work product protection may apply. The eventual filing of three separate lawsuits challenging the rescission of the gainful employment regulations makes clear that ED's assessment about the probability of litigation was an objectively reasonable one.

14

To start, plaintiff's claim that communications with non-parties obviates work product protections mistakenly construes the doctrine too narrowly. The D.C. Circuit has made clear that "disclosure to a third party does not waive the privilege unless such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary," and "waiver would occur . . . only if the disclosure substantially increases the possibility of an opposing party obtaining the information." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) (quotation marks omitted); *accord Deloitte LLP*, 610 F.3d at 139 ("While voluntary disclosure waives the attorney-client privilege, it does not necessarily waive work-product protection."); *see also Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 590 (2d Cir. 2022) (explaining that the work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3)(A), "sweeps broadly, such that documents memorializing '[n]ot only an attorney's mental impressions and opinions about a case but also the results of the attorney's factual investigations in anticipation of the case may constitute attorney work product'") (quoting *N.Y. Times Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 489 (2d Cir. 2019)). Plaintiff provides no reason why disclosure to the SSA of some limited contextual information for Finley's request "is inconsistent with the maintenance of secrecy from the disclosing party's adversary," *Am. Tel. & Tel. Co.*, 642 F.2d at 1299 (citation omitted), considering that ED and SSA had engaged in joint conduct, pursuant to the MOU, to implement the gainful employment regulations that were the subject of litigation challenge. Furthermore, when initiating the email communication with the SSA's Office of General Counsel, Finley "informed them that [he] was seeking information regarding SSA's decision not to renew the 2013 MOU with" ED, Finley Decl. ¶¶ 8–9; *see also Vaughn* index. Far from being inconsistent with maintaining the confidentiality of attorney work product, these disputed emails between two agencies' counsel instead evince ED's efforts to

prepare for pending and anticipated litigation concerning the gainful employment regulations. Merely because SSA is a non-party simply does not preclude ED's assertions of work product protection over the withheld emails.[6]

Plaintiff highlights Finley's representation in his declaration that the disputed emails were also "intended to help establish a robust administrative record for the rescission," Finley Decl. ¶ 10, but this a misfire. As noted, *see supra* n.2, Finley clarified in his supplemental declaration that establishing a robust administrative record "was not the primary reason for my outreach to SSA," and his use of the word "establish" "was inaccurate because the rescission rule had already been issued," and he "should have more precisely stated that [his] September 2019 emails . . . sought information that might bolster the Department's statements in the rescission rule that SSA declined to renew the MOU, to defend against any future challenge to the rescission rule that raised issues similar to those raised by the *Maryland* plaintiffs." Finley Suppl. Decl. ¶ 7. *In camera* review confirms that the disputed emails were expressly made to gather information from SSA about the MOU termination in preparation for ED's litigation.

### C. No Waiver of Attorney Work Product Protection

Plaintiff contends that even if work product protection covers the disputed emails, ED has waived such protection through inconsistent conduct in this litigation and in other litigation. As support, plaintiff correctly points out, Pl.'s Reply at 8–12, that courts "have not looked favorably on litigants that, having asserted that documents must not be disclosed on one basis, mutate their arguments at the last moment to avoid an adverse ruling requiring production." *Mischler v. Novagraaf Grp. BV*, No. 118-CV-2002 (TJK/GMH), 2019 WL 6135447, at *6 (D.D.C. Nov. 19,

---

[6] For the same reasons, plaintiff's argument that Finley's communications waive ED's work product protection over the disputed emails because defendant lacks common interest with the SSA also fails. *See* Pl.'s Cross-Mot. at 14.

2019); *see also Neuberger Berman Real Est. Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 230 F.R.D. 398, 418 (D. Md. 2005) ("Defendants' deliberate withdrawal of the privilege assertion from privilege logs notably in lieu of a response to plaintiff's counsel's objections to the insufficiency of the stated basis demonstrates a forfeiture of the privilege."). Yet, the so-called "waiver 'rule'" identified by plaintiff, Pl.'s Reply at 10, is not a game of gotcha requiring waiver when an agency clarifies the basis for withholding or explanations for assertions of privilege. Under these circumstances, only when the party's conduct reflects their "efforts to reshape [their] legal contentions in the wake of an adverse ruling," *Gen. Elec. Co. v. Johnson*, No. 00-CV-2855 (JDB), 2007 WL 433095, at *4 (D.D.C. Feb. 5, 2007), or post-hoc efforts to "re-engineer their privilege logs to align their privilege assertions with their legal arguments," *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 299 (S.D.N.Y. 2003), is a waiver finding justified.

No waiver of work product protection has occurred here. Plaintiff says that ED has "waived the applicability of the work-product protection by placing into the record, in *Baltezar* [*v. Cardona*, No. 5:20-cv-455 (N.D. Cal.) ("*Baltezar*")], a statement that is absolutely contradicted by Mr. Finley's declaration," because in *Baltezar*, defendant "filed a declaration from a senior official asserting that SSA had 'declined requests from defendant to provide any written response confirming it would not renew the MOU,'" while ED here asserts that the disputed emails "contain an SSA employee's description of 'her understanding of SSA's position.'" Pl.'s Opp'n at 14–15 (citations omitted). Yet, the *Baltezar* declaration is not inconsistent with the Finley declarations in this litigation. ED's declarant in *Baltezar* stated that, prior to the MOU expiring in May 2018: (1) ED "requested that SSA agree to renew the MOU, but SSA did not do so"; (2) ED's "understanding [was] that the SSA orally communicated to attorneys in the Department's Office of the General Counsel that it was not inclined to renew the MOU"; and (3) SSA "did not agree to

17

renew the MOU and also declined requests from the Department to provide any written response confirming it would not renew the MOU." Def.'s Reply at 11 (quoting *Baltezar*, Def.'s Mot. to Dismiss, Decl. of Diane Auer Jones, ECF No. 26-1 ¶ 6 (N.D. Cal. May 26, 2021)). Meanwhile, Finley explained in his declaration that he asked SSA for information related to "SSA's decision not to renew the . . . MOU with the Department, and [an attorney for SSA] described her understanding of the SSA's position." Finley Decl. ¶ 9. Finley did not request, nor did SSA apparently provide, a statement in writing from SSA about the latter's declination to renew the MOU. Finley merely sought assistance in responding to the *Maryland* plaintiffs' argument that ED provided *no evidence* of the SSA declining to renew the MOU because ED did "not have anything from SSA on that point." Finley Suppl. Decl. ¶ 6.

Plaintiff also cries foul at ED shifting the basis for work product protection from initially representing that the disputed emails were prepared by Finley in "reasonable *anticipation of litigation* regarding SSA's decision not to renew the MOU with" ED, Pl.'s Reply at 4 (quoting Pl.'s CSMF ¶ 20) (emphasis in original), to then add, in defendant's combined opposition and reply, that the basis was to "respond to issues raised in *Maryland v. U.S. Dep't of Education*, a previously unmentioned lawsuit that was *pending* at the time he corresponded with SSA," *id.* at 5 (citing Finley Suppl. Decl. ¶ 6). To be sure, in the *Vaughn* index and in ED's motion for summary judgment, the agency represented that the disputed emails were made in *anticipation* of future litigation, but later asserted, in opposition to plaintiff's cross-motion for summary judgment, that Finley's exchanges with SSA were also made for the purpose of preparing for *pending* litigation in *Maryland*. Compare *Vaughn* Index at 18–26 (asserting that each disputed email "was prepared by Mr. Finley in reasonable anticipation of litigation regarding SSA's decision not to renew their gainful employment MOU with Education"); Def.'s Mot at 1–2 (arguing that disputed emails were

18

made "in reasonable anticipation of potential litigation concerning the Department's rescission of the gainful employment rule regulations"), *with* Def.'s Reply at 11 (explaining that the purpose of Finley's email to SSA on September 20, 2019, was to "respond[] to the *Maryland* plaintiffs' argument that the Department provided no evidence of the SSA declining to renew the MOU"). Such waffling explanations may, as here, prompt the need for *in camera* review of the disputed withheld records.

Notwithstanding some inconsistency in ED's justification for application of work product protection, no waiver is warranted here because either (or both) proffered reason supports such protection.[7] The *Maryland* litigation was pending at the time that Finley communicated with SSA, and his supplemental declaration and the disclosed redacted September 20, 2019 email reflects that he sought information from SSA to help ED prepare for that litigation. Meanwhile, as discussed earlier, ED's anticipation of litigation concerning the rescission of the gainful employment regulations was a reasonable one. *See supra* at Section III.B.[8]

## IV. CONCLUSION

---

[7] As support for a waiver finding, plaintiff relies on the non-binding case of *General Electric Company v. Johnson*, Pl.'s Reply at 9, where another Judge on this Court determined that an agency's "fresh privilege claims" "smack[ed] of an attempt by [the agency] to get a second bite at the apple by 're-engineering' its privilege log to advance legal arguments that it failed to make at earlier stages of the litigation" because they "follow[ed] on the heels of a legal ruling rejecting the other bases for withholding the requested documents," 2007 WL 433095, at *4, but that case is inapposite. In contrast to *General Electric Company,* ED's initial and updated explanations for work product protection both support such protection and thus do not reflect the type of gamesmanship found to warrant a finding of waiver in the cited case.

[8] Plaintiff also challenges ED's efforts to segregate and disclose non-protected, responsive information in the disputed emails. Pl.'s Opp'n at 19. While, generally, FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection," 5 U.S.C. § 552(b), the law in this Circuit is clear that "[i]f a document is fully protected as work product, then segregability is not required." *Jud. Watch, Inc. v. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005). Since the doctrine "does not distinguish between factual and deliberative material," *id.* (quoting *Martin v. Off. of Special Counsel,* 819 F.2d 1181, 1187 (D.C. Cir. 1987)), any document prepared in anticipation of litigation is protected completely, whether it contains an attorney's mental impressions or merely collects facts, *id*. In any event, *in camera* review confirms the agency complied with its segregation obligations.

For the above reasons, ED's Motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. An order consistent with this Memorandum Opinion will be issued contemporaneously.

Date: July 11, 2023

                                                                                            _____
                                                                                            **BERYL A. HOWELL**
                                                                                            U.S. District Court Judge